**UKRAINIAN–AMERICAN BAR ASSOCIATION, INC., et al., Appellants,**

v.

**James A. BAKER, III, Secretary of State, et al.**

Nos. 88–5337, 88–5338.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 12, 1989.

Decided Jan. 26, 1990.

Andrew Fylypovych, of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of the Court, with whom Michael Waris, Jr., was on the brief, for Ukrainian–American Bar Ass'n, Inc., et al.

R. Craig Lawrence, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, Asst. U.S. Atty. and James G. Hergen, Asst. Legal Advisor, Dept. of State, were on the brief, for James A. Baker, III, Secretary of State, et al.

Before BUCKLEY, D.H. GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Opinion concurring in the judgment filed by Circuit Judge SENTELLE.

D.H. GINSBURG, Circuit Judge:

The district court ordered the Secretary of State and the Immigration and Naturalization Service to give Soviet and East Bloc aliens seeking asylum in the United States a notice advising them of the offer of the Ukrainian–American Bar Association (UABA) to provide them free legal advice. *See Ukrainian–American Bar Ass'n v. Shultz*, 695 F.Supp. 33 (D.D.C.1988). In these cross-appeals, UABA maintains that the notice should include certain additional language and the Government maintains that the courts lack jurisdiction of this cause and, in the alternative, that the Government has no obligation to provide any information to would-be asylees about UABA's offer of legal assistance. Finding no bar to jurisdiction, we hold that the district court erred on the merits in granting relief.

## I. BACKGROUND

This case arises from the dramatic attempt by a Ukrainian merchant seaman, Myroslav Medvid, to obtain political asylum in the United States. On the evening of October 24, 1985, Medvid jumped off a Soviet grain ship while it lay at anchor in the Mississippi River near New Orleans. He swam to shore, asked to be taken to the police, and was eventually brought to the local office of the U.S. Border Patrol. An official there telephoned an INS-certified Ukrainian interpreter, who translated a forty-five minute conversation between Medvid and the authorities. In the course of that conversation, Medvid was given a standard *Miranda* warning, including the advice that he was entitled to an attorney and that an attorney would be provided for him if he could not afford one. Medvid did not take up the offer of legal assistance.

The agent who interviewed him reported that Medvid "claims that he jumped ship in the United States for political and moral reasons," but the Border Patrol did not then pursue the possibility that Medvid was entitled to asylum. Instead, it returned him to Soviet custody shortly after the interpreted telephone interview. On October 28, the Coast Guard took Medvid from the Soviet ship to a U.S. Naval Base to be interviewed again. He was apparently returned to his ship the next day.

Also on October 28, Orest Jejna, an attorney and one of the plaintiffs below, learned of this incident from a news report. He contacted the State Department, the Border Patrol, and the INS that day, offering to assist Medvid in seeking political asylum. The Government rejected his offers. Plaintiff Julian Kelas likewise contacted the INS and the State Department and received the same response.

The UABA, Jejna, and Kelas filed this suit on November 1 in order to prevent Medvid's ship from departing with him aboard. The district court denied that relief and, after a highly expedited appeal, this court affirmed. *Ukrainian–American Bar Ass'n, Inc. v. Shultz*, No. 85–6062, mem. op. (D.C.Cir. Nov. 5, 1985). The district court has since found that when the ship left U.S. waters on November 9, Medvid had "stated that he did not wish to seek asylum any more."

Plaintiffs thereafter amended their complaint to allege that it is the Government's

policy to deny them access to potential political asylees such as Medvid, and that that policy has "denied the plaintiffs their rights of access to Medvid and others like him under the First Amendment to counsel such individuals regarding their Constitutional and statutory right to apply for political asylum." Plaintiffs sought, *inter alia,* that the governmental defendants be ordered to notify the plaintiffs each and every time a person from the USSR seeks or appears to be seeking, or when there is a question whether such a person is seeking political asylum in the U.S. and that access to said individual be granted immediately.

The district court acknowledged the plaintiffs' claimed first amendment right—in essence, a "right to counsel others"—but granted them only part of the relief they sought. It ordered the INS to forward plaintiffs' offer of legal assistance to each person seeking asylum from a Soviet or East Bloc country, but it did "not require, as plaintiffs originally requested, the government to notify the UABA every time a Ukrainian seeks political asylum here or to provide access without the individual specifically requesting legal assistance."

## II. Jurisdiction

The Government argues that the district court had no jurisdiction to adjudicate the UABA's claims because: there is no live case or controversy between the parties; the plaintiffs lack standing; and the issue plaintiffs raise is a non-justiciable political question. Alternatively, even if the courts have jurisdiction, the Government suggests that we should stay our hand because the case has become too attenuated. We address each of these threshold issues before considering the merits.

### A. *Mootness*

█ In asserting that no live case or controversy remains, the Government proceeds from a mistaken view of the nature of plaintiffs' amended complaint and of the district court's findings. The district court found, on the bases of the Medvid incident and of the affidavit of a State Department official, that it is the Government's policy to deny lawyers access to an alien in Medvid's situation. The Government does not now deny the existence of such a policy; *i.e.,* it does not assert that it would grant plaintiffs the access they request were the same incident to occur today, or if it would not, that the reason would be some different policy than the one of which plaintiffs have complained. Instead, the Government claims that because Medvid is long gone from the United States, there is no longer any subject matter over which to dispute.

That the particular situation that precipitated the constitutional challenge to the Government's policy is no longer "live" is not determinative, however. *See Super Tire Eng'g Co. v. McCorkle,* 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974); *Allende v. Shultz,* 845 F.2d 1111, 1115 n. 7 (1st Cir.1988). The Government's failure to contest the existence of the alleged policy precludes it from prevailing in the argument that the controversy became moot once Medvid left the country; the complaint challenges the Government's policy, not merely the Government's handling of the Medvid incident.

The Government argues in the alternative that the Medvid case was a fluke. It concedes that INS Operating Instruction 208.8, which establishes a procedure for dealing with "immediate action cases" involving nationals of Soviet and East Bloc countries, was violated in the Medvid case, and it tries to use that concession as evidence that the Medvid facts are unique and therefore an insufficient basis upon which to predicate generic relief. The Government does not claim, however, that plaintiffs would have been granted access to Medvid had the Operating Instruction been followed, much less that they will be granted access to similarly situated individuals in the future. Accordingly, we have no basis upon which to doubt the district court's finding that it is the Government's policy to deny lawyers access to a potential asylee from a Soviet or an East Bloc country.

**1378**

### B. *Attenuation*

██ The Government argues that the court should decline to adjudicate the present dispute because it has become too attenuated with time: "The unique incident involving Seaman Medvid has long since past, and the UABA plaintiffs have failed to identify any remotely comparable occurrence." Under the doctrine of attenuation, a court may indeed, upon prudential grounds, "refuse to entertain a suit which, while 'not actually moot, is so attenuated that considerations of prudence and comity ... counsel the court to stay its hand, and to withhold relief it has power to grant.'" *Community for Creative Non–Violence v. Hess (CCNV)*, 745 F.2d 697, 700 (D.C.Cir. 1984) (*quoting Chamber of Commerce v. United States Dept. of Energy*, 627 F.2d 289, 291 (D.C.Cir.1980)). This doctrine counsels abstention when "the defendant voluntarily has discontinued the challenged activity." *Id.* The Government's attempt to invoke the doctrine is unavailing here, however, because it does not assert that it will permit access to aliens such as Medvid in the future. In other words, the case is not too attenuated to command our attention for the same reason that it is not moot: the policy has not changed.

### C. *Standing*

██ In order to establish his standing to challenge a particular act or policy, a litigant must "'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (citations omitted). So our first inquiry is into the question of injury *vel non.*

Plaintiffs assert that the Government's failure to provide them access to individuals in Medvid's situation, which prevents them from counseling such persons regarding their rights—and presumably prevents such persons from engaging plaintiffs to represent them—infringes the plaintiffs' first amendment rights and hampers their pursuit of their political agenda. The district court found that "the essentially political goal[ ] that [lies] near the [plaintiffs'] core purpose [is] the beneficial integration of individuals of Ukrainian descent into the American legal and political society." The Government suggests that in so saying plaintiffs assert only a generalized grievance, not a "concrete harm to them." We think, however, that their claim alleges a "demonstrable, particularized injury," *see Warth v. Seldin*, 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975), albeit barely rising to the constitutional minimum.

By denying plaintiffs the opportunity to communicate their particular message to the uniquely relevant audience, the Government surely causes them a "personal and concrete" injury. *Kurtz v. Baker*, 829 F.2d 1133, 1142 (D.C.Cir.1987). Or in another variation of the standard, plaintiffs have shown that they are injured sufficiently to support their standing because they "personally would benefit in a tangible way from the court's intervention," *Warth v. Seldin*, 422 U.S. at 508, 95 S.Ct. at 2210, *viz.* by gaining access to potential defectors, some of whom would accept their offer of legal services. The plaintiffs' organizational purpose of furthering "the beneficial integration of individuals of Ukrainian descent [*et cetera* ]" requires, after all, that plaintiffs have the opportunity to tender their services to Ukrainians who have reached the United States. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982); *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 799 (D.C.Cir. 1987) (opinion of Bork, J.). Because the UABA provides such counseling as part of its political agenda, it is apparent that the inability to counsel potential asylees would interfere with the plaintiffs' activities, which distinguishes their injury from the sort of "abstract social interest" that is insufficient to confer standing. *See id.* at 818 (Buckley, J., concurring).

Nor is the injury alleged only speculatively traceable to the conduct of the

Government; indeed, the defendants can assert the contrary only because they misperceive the amended complaint as alleging a "regulatory violation." Plaintiffs assert a violation of their own claimed constitutional right to contact and to offer counsel to a potential asylee such as Medvid, and not either a violation of the alien's right to counsel or of their own right to give counsel under the defendants' regulations.

Thus construed, the injury is both traceable to and redressable by the Government. The elements of traceability and redressability are but variations on a theme of causation: "that the injury was not only caused by the action challenged but can be alleviated by that action's cessation." *Id.* at 799 (opinion of Bork, J.). The UABA was unable to speak to Medvid—the operational aspect of the injury alleged—because the Government would not allow them to contact him while in "immediate action" status; if the plaintiffs' case on the merits requires that the Government grant them access, the court could remedy that alleged injury prospectively. Plaintiffs therefore have standing to bring this challenge.

The problem of causation presented in *Gracey* was different in kind because the nature of the injury alleged there was different. Where the UABA asserts a constitutional right to contact an immediate action alien in government custody, the Haitian Refugee Center claimed only that the Government's program of interdicting Haitians on the High Seas violated the statutory rights of the shipboard aliens. *Id.* at 798. The two cases would be analogous if the HRC had claimed a right (frivolous though the claim might be) to be present on board Coast Guard ships when they intercepted Haitian refugees. The HRC would then have been asserting an injury to itself distinct from the generalized injury that it actually claimed, which was no different from that felt by "any American who would enjoy meeting unidentified aliens of a particular nationality denied entry to the United States." *Id.* at 800. In fact, as Judge Bork pointed out, the court in *Gracey* had before it: "a complaint in which a right of association is recited as a basis for standing but no aspect of the interdiction program is alleged to violate the first amendment. A party cannot have standing on the basis of a legal right he does not claim is violated." *Id.*

Thus, we see that it was not because the HRC's organizational purpose was to promote the well-being of Haitian refugees that it lacked standing; rather it was because the only concrete injury it alleged was a diminution in the number of such refugees arriving at its doorstep, and there was simply no indication either that the reduction in the number of aliens entering the United States "would make an appreciable difference in [the HRC's] ability to serve the Haitian refugee community," *id.* at 818–19 (Buckley, J.), or that "absent the interdiction program, at least one Haitian refugee would agree to be counseled or represented by the HRC and at least one would consent to associate with the individual appellants," *id.* at 806–07 (Bork, J.). Or, to restate the matter in Judge Bork's terms, the Government's refusal to allow the plaintiffs to contact Medvid when he was in custody, unlike its refusal to allow into the United States refugees who might eventually have found their way to the HRC, constitutes a "legal prohibition on [the UABA's] relationship with a third party." *Id.* at 801. The injury claimed by the UABA is thus the direct and intended result of, indeed part and parcel of, the Government's policy of denying all civilians access to an immediate action alien who has not requested counsel, and not "merely an unintended side-effect of the [immediate action] program." *Id.* at 810.

Consider, furthermore, that if an organizational plaintiff could establish its standing to challenge a Government action only by showing that the relief it seeks would further its organizational purpose—as opposed to merely vindicating its rights—then its ability to pursue a first amendment challenge would depend upon its showing that, if it were permitted to speak, others would not only hear but listen to and heed its words. The right to speak protected by the first amendment is not, however, a right to be heeded; it is abridged even when speech that we may think would not

make a mark in the marketplace of ideas is denied the opportunity to compete for acceptance. *Cf. Branzburg v. Hayes*, 408 U.S. 665, 704, 92 S.Ct. 2646, 2668, 33 L.Ed.2d 626 (1972) ("liberty of the press is the right of the lonely pamphleteer"). We may not, by denying standing under the rubric of causation, narrow the protection afforded by the first amendment.*

#### D. *Political Question*

■ The Government asks us to find that plaintiffs' claim presents a political question because the treatment to be afforded "the delicate and sensitive area of how the United States will deal with immediate action cases" is a matter reserved to the political branches. We recognize that in dealing with aliens "the role of the judiciary ... does not extend to imposing procedures that merely displace congressional"—or, we might add, executive—"choices of policy." *Landon v. Plasencia*, 459 U.S. 21, 34–35, 103 S.Ct. 321, 330–31, 74 L.Ed.2d 21 (1982).

■ That a claim implicates important governmental policies, however, does not necessarily mean that the political question doctrine precludes the judiciary from hearing it. Here, plaintiffs' claim of a right, grounded in the first amendment, to have certain potential asylees advised of their offer of services is cognizable because the court is competent to consider the strength of the governmental interests involved. *See Flynn v. Shultz*, 748 F.2d 1186, 1190–91 (7th Cir.1984) (finding challenge to State Department action not a political question but "proceed[ing] fully cognizant of the constitutionally committed powers of the executive in the area of foreign affairs"). If plaintiffs prevail, the political question doctrine may, to be sure, foreclose certain forms of relief; so long as there are, however, "judicially discoverable and manageable standards for resolving" the dispute without intruding into the realm of discretion properly reserved to the other branches of government, the underlying issue is not itself a non-justiciable political question. *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). And so to

### III. THE MERITS

■ The district court held that the Government must "furnish each person seeking asylum who is identified as coming from a Soviet or East Bloc[ ] country information ... describing UABA's offer to render free legal services" because such notification is necessary to further the UABA's political agenda. The district court found the plaintiffs' right to such governmental assistance in the reasoning of *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). In that case, the Supreme Court, finding that litigation may be "a form of political expression" protected by the first amendment, *id.* at 429, 83 S.Ct. at 335–36, held unconstitutional a law the result of which was that "a person who advises another that his legal rights have been infringed and refers him to a particular attorney or group of attorneys ... for assistance has committed a crime, as has the attorney who knowingly renders assistance under such circumstances," *id.* at 434, 83 S.Ct. at 338–39.

We see no theory, in *Button* or elsewhere, by which the Constitution guarantees the plaintiffs governmental assistance in pursuing their political objectives. To be sure, the first amendment guarantees their right to be free of governmental restraints on "political expression" and that right is violated if the Government affirmatively interferes with constitutionally protected litigation as a form of political expression. Here the Government has done no such thing. It is not surprising, therefore, that the district court did not identify any violation of plaintiffs' constitutional rights.

The district court apparently rested its grant of relief on the non-sequitur that because the UABA needs access to asylum-seekers in order to represent them, the Government is obligated affirmatively to

---

* Since the UABA asserts only the constitutional right to contact immediate action detainees, and makes no claim under any statute either on its own behalf or that of any alien, there is no question of prudential standing in this case.

provide aliens with notice of plaintiffs' availability. Charitably viewed, this may mean that the Government interferes with the exercise of plaintiffs' first amendment rights because it exerts exclusive control over an alien while he is in custody. We will therefore consider whether the Government, once having acted to place the alien in custody, violates the first amendment rights of third parties when it declines to make provision for them to contact him.

■] From cases concerning a lawyer's right to advertise for and to solicit clients, *see, e.g., Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988); *In re Primus,* 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978), plaintiffs argue that their right of access to potential clients outweighs any countervailing governmental interest. Those cases, however, protect only the first amendment right to engage in such activities free from governmental interference; they do not establish an affirmative right to the Government's assistance in identifying and furnishing information to potential clients. Nor do they allow that lawyers have any right in the first amendment that is not the common legacy of every citizen. Thus, when an unadmitted alien is taken into custody for interrogation and "immediate action," his entrance into custody does not infringe the right of any third party—whether a lawyer or another with an interest in getting a message through to the alien—to engage in constitutionally protected political expression. Insofar as a dictum in *Jean v. Nelson,* 727 F.2d 957, 983–84 (11th Cir.1984) (*en banc*), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), suggests that "counsel have a first amendment right to inform [detained aliens] of their rights, at least when they do so as an exercise of political speech without expectation of remuneration," we respectfully disagree.

■ Furthermore, the Government does not infringe a third party's first amendment right to associate with an alien by holding the alien for a period of time during which the third party is unable to contact him. The loss of the right of association while the alien is held incommunicado

by the Government is not of constitutional significance; it is but an indirect consequence of the Government's pursuit of an important task, *viz.* resolving "immediate action" cases. The ultimate source of plaintiffs' concern—that upon the alien's return to Soviet or East Bloc authorities he may be effectively unavailable to them—is an unfortunate consequence of international politics but not an infringement of plaintiffs' first amendment right of association.

■ Plaintiffs' assertion that the first amendment guarantees them access to "immediate action" aliens is analogous to a claim that the Government's interview of a potential defector constitutes a public forum, wherein all persons have a right to express their views. In *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court recognized that, with respect to a place "which is not by tradition or designation a forum for public communication," the Government "may reserve the forum for its intended purpose, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* at 46, 103 S.Ct. at 955–56. *See also Adderley v. Florida,* 385 U.S. 39, 41–42, 87 S.Ct. 242, 244–45, 17 L.Ed.2d 149 (1966) (jailhouse not a public forum). The interview of an "immediate action" alien is a non-public forum with a specific and important governmental purpose. The Government's exclusion of private citizens, so long as it is not selective and based upon the content of their views, is not a violation of the public forum doctrine.

If there were a first amendment right to speak in such a forum, the Government might find it very difficult to get on with the business of governing. To admit everyone who would like to advise the alien, each in accordance with his own view of the good life, and to communicate their offers of assistance would impose a substantial burden upon the Government. Religious counselors, doctors, political activists, journalists, and a host of others might want to speak with a potential defector in

order to offer their services or advice. The multiplicity of requests for access to a single alien or to different categories of aliens would divert the Government from its priority of resolving the issue requiring "immediate action." Plaintiffs ask that we distinguish *pro bono* lawyers from all others who might wish to contact an "immediate action" alien because, in their view, the Government can provide all services but legal advice. Even if this were true, however (and it hardly seems true that the Government could provide a spiritual but not a legal adviser), it would not provide a justification to deny access to the others if there is a first amendment right of access—recall that lawyers have no special first amendment status—that is independent of the alien's right to counsel.

Plaintiffs wisely do not assert that they have a right to contact Medvid that is somehow derivative of his right to counsel. Medvid was given a *Miranda* warning, which included the advice that he had the right to an attorney. It is doubtful that the Government was constitutionally obliged to give even that warning, since an alien coming ashore inside the United States is "treated as if stopped at the border," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 631, 97 L.Ed. 956 (1953), and "[the Supreme] Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329. While this court has not addressed the question, other circuits have held that an unadmitted alien has no sixth amendment right to counsel even in the civil deportation process. *Lozada v. INS*, 857 F.2d 10, 13 (1st Cir.1988); *Baires v. INS*, 856 F.2d 89, 90 (9th Cir. 1988); *cf. id.* at 90–91 (statutory right to counsel at own expense in deportation proceedings).

■ Even if Medvid had a right to counsel, the Government would not have to permit a lawyer to speak with him unless he asserted that right. In *Moran v. Bur-*

*bine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), in which a police department failed to inform a criminal suspect that a lawyer had attempted to contact him by telephone, the Supreme Court found that the sixth amendment "becomes applicable only when the government's role shifts from investigation to accusation." *Id.* at 430, 106 S.Ct. at 1145. The Court found "untenable as a matter of both logic and precedent" the proposition that the failure to inform the defendant of the telephone call affected his rights, and stated that it was not "prepared to adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him." *Id.* at 422, 425, 106 S.Ct. at 1141, 1143. It would seem to follow that in the non-criminal context of an asylum interview, in which the sixth amendment does not give the interviewee a right to counsel, the Government is under no obligation to advise him that a volunteer could be engaged for him. Where it is the attorney who claims the right to have such advice conveyed, we should be even less prepared to rule that the first amendment requires the Government to lend its assistance.

The decision of the district court is therefore

*Reversed.*

SENTELLE, Circuit Judge, concurring in the judgment:

While I concur with my colleagues that the District Court erred in granting relief to appellants and that the judgment must be reversed, I cannot join their reasoning. I write separately, not to disagree with the majority's discussion of the merits of appellant's claim; but rather, because we should never have reached those merits at all. In my view, appellants lack standing to bring the instant action.

### I. ANALYSIS

The claim of the Ukrainian American Bar Association ("UABA"), although expressed in conceptually different terms, is not in any meaningful way distinguishable from the claim asserted in *Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C.Cir.1987),

a case in which we found no standing. In that case, the Haitian Refugee Center ("HRC") alleged a purpose "to promote the well-being of Haitian refugees through appropriate programs and activities, including *legal representation of Haitian refugees,* education regarding legal and civil rights, orientation, acculturation, and social and referral services." *Id.* at 799 (emphasis supplied). The purpose of the HRC obviously parallels that of the UABA, which is to accomplish "the beneficial integration of individuals of Ukrainian descent into the American legal and political society," Maj. op. at 1378 (quoting the District Court's opinion) and specifically "to counsel [Ukrainian would-be defectors] regarding their Constitutional and statutory right to apply for political asylum." Maj. op. at 1376 (quoting amended complaint). In that case, as in this, the associational plaintiff asserted that actions of the government— in that case an interdiction, in this the "immediate action" procedures—interfered with their organizational purposes by denying access to potential beneficiaries of the advice and counsel which the organization exists to provide. The majority points out that the HRC lacked standing "because the only concrete injury it alleged was a diminution of such [Haitian] refugees arriving at its doorstep...." Maj. op. at 1379. The majority agrees that the government's "refusal to allow into the United States refugees who might eventually have found their way to HRC" did not "constitute[ ] a 'legal prohibition on [the HRC's] relationship with a third party.' " Maj. op. at 1379 (quoting *Gracey,* 809 F.2d at 801 (Bork, J.)).

These statements summarize much of my complaint with the majority's standing analysis. Under the "entry doctrine" analysis, persons in the situation of Medvid have no more entered the United States than the Haitians in *Gracey.* As the Eleventh Circuit said in *Jean v. Nelson,* 727 F.2d 957, 969 (11th Cir.1984) (en banc), the Supreme Court has made it clear " 'that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States.' "

(quoting *Leng May Ma v. Barber,* 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958)). Indeed, the Supreme Court "has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border." *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 215, 73 S.Ct. 625, 630–31, 97 L.Ed. 956 (1953). *Accord Ahrens v. Rojas,* 292 F.2d 406, 410–11 (5th Cir.1961). *See also Augustin v. Sava,* 735 F.2d 32, 36 (2d Cir.1984) ("An unofficial entry is permitted which has no effect on the 'unadmitted' alien's status, because it does not constitute a legal entry even though the alien is physically present in the United States."); *El Rescate Legal Services v. INS,* 727 F.Supp. 557 (C.D.Cal.1989) (same); *United States v. Anaya,* 509 F.Supp. 289, 296 (S.D.Fla.1980), *aff'd sub nom. United States v. Zayas–Morales,* 685 F.2d 1272 (11th Cir.1982) ("An alien does not enter the country simply 'by crossing the national boundaries in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission.' ... To accomplish an 'entry' an alien must be present in the United States *and* free of official restraint.") (citations omitted) (emphasis in original); *Singh v. Nelson,* 623 F.Supp. 545, 550 (S.D.N.Y.1985) (grant of parole "does not mean that an excludable alien who is paroled has technically entered the United States."). The entry doctrine is of considerable antiquity, *see, e.g., Kaplan v. Tod,* 267 U.S. 228, 230–31, 45 S.Ct. 257, 257–58, 69 L.Ed. 585 (1925); *United States v. Ju Toy,* 198 U.S. 253, 263, 25 S.Ct. 644, 646–47, 49 L.Ed. 1040 (1905); *Nishimura Ekiu v. United States,* 142 U.S. 651, 661, 12 S.Ct. 336, 339, 35 L.Ed. 1146 (1892); *Ng Lin Chong v. McGrath,* 202 F.2d 316, 318 (D.C.Cir.1952); *Kristensen v. McGrath,* 179 F.2d 796, 802 (D.C.Cir.1949), and its extended tenure and continued vigor derive from the fact that, as the Supreme Court recently reaffirmed, "the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).

Thus, all that the government has done here is signal its "refusal to allow into the United States refugees who might have eventually found their way to [UABA] . . .," Maj. op. at 1379, a refusal that the majority concedes is not a prohibition on the association's relationship with a third party and is therefore insufficient to grant standing. The actions of the Executive here may indeed result in a reduction in the number of Ukrainian refugees entering the United States. As the majority notes, however, "there [is] simply no indication either that the reduction in the number of aliens entering the United States 'would make an appreciable difference in [the UABA's] ability to serve the [Ukrainian] refugee community,' . . . or that 'absent the [immediate action] program, at least one [Ukrainian] refugee would agree to be counseled or represented by the [UABA] and at least one would consent to associate with the individual [UABA members].'" Maj. op. at 1379 (citation omitted). The UABA can hardly claim a concrete First Amendment injury from the fact that a person with whom they might wish to have contact is not in any legal sense even present in the United States, although he may eventually arrive at some point in the future.

In *Gracey*, the Court spoke with three voices, but all agreed or assumed that HRC had properly pleaded the "injury in fact" element necessary for Article III standing. *Id.* at 800 (opinion of Bork, J.); *id.* at 817–18 (Buckley, J., concurring) (expressing doubt, but "conceding injury"); *id.* at 822–23 (Edwards, J., concurring in part). Nonetheless, as the opinions of both Judges Bork and Buckley conclude, HRC lacked Article III standing by reason of its failure to meet the other two Article III requirements—causation and redressability. Though Judges Bork and Buckley differed in their analyses of HRC's failure, both reached the same conclusion. The present allegations, whether subjected to Judge Bork's or Judge Buckley's analysis, no more demonstrate causation and re-

dressability than did the allegations of HRC in *Gracey*.

## A. The Bork Analysis

Judge Bork in his *Gracey* opinion first notes that " 'traceability' and 'redressability' . . . are closely related," *id.* at 801, and that traceability "examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas [redressability] examines the causal connection between the alleged injury and the judicial relief requested." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984)).

Bork then conducts a review of such Supreme Court authorities as *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); and *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), *inter alia*, from which he concludes that "[s]tanding doctrine, and in particular the causation aspect of that doctrine," is to be informed by separation of powers concerns, and specifically is "designed to confine federal courts to their 'properly limited' function." 809 F.2d at 805.[1] As to the "traceability" component of the Article III standing inquiry required by *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982), Judge Bork argues that " 'causation' in this context is something of a term of art, taking into account not merely an estimate of effects but also considerations related to the constitutional separation of powers as that concept defines the proper role of courts in the American governmental structure." *Gracey*, 809 F.2d at 801 (footnote omitted). Supreme Court precedent indicates that a legal prohibition on a litigant's association with a third party is sufficient

---

**1.** I have not attempted to fully replicate Judge Bork's discussion of the separation of powers content of the standing doctrine. For further elucidation the reader, of course, may consult the *Gracey* opinion.

to grant the litigant standing independent of a prediction concerning the third party's actions. *See, e.g., Craig v. Boren,* 429 U.S. 190, 194–95, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973). However,

> [i]n the absence of a legal prohibition on his relationship with a third party, the litigant may establish article III causation only if the governmental action he complains of has purposefully interfered with that relationship. Without a purposeful interference ... the litigant would lack article III standing no matter how copious a factual showing of causation he might make.

> .     .     .     .     .

> No decision of the Supreme Court has been found that goes so far as to find article III causation for injury to a litigant's relationship to a third party in the absence of a statute or executive action aimed at deterring the litigant from participating in the relationship.

*Gracey,* 809 F.2d at 801 (footnote omitted). Thus, because "the interdiction program [was] not aimed at preventing Haitian refugees from dealing with the HRC [,] [t]he prevention of that relationship is merely an unintended side effect of the program." *Id.* Specifically, Bork relies on *Warth* and *Wright* for the proposition that " 'the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," ... and only when adjudication is "consistent with a system of separated powers...." ' " *Id.* at 806 (quoting *Wright,* 468 U.S. at 752, 104 S.Ct. at 3325) (interior citations omitted).

When the allegedly denied association "depend[s] upon a prediction about the independent action of a third party not before the court," *id.* at 806, the requisite last resort and necessity do not exist. In *Gracey,* Bork concludes that the injuries of the HRC and the capacity of judicial action to redress those injuries depended on such a prediction, that is "whether, absent the interdiction program, at least one Haitian refugee would agree to be counseled or represented by the HRC and at least one would consent to associate with the individual appellants." *Id.* In the present case, the only distinction is that the prediction concerns Ukrainians rather than Haitians, a matter of no legal significance.

Bork further concludes that when the program under attack "was not designed to interfere with HRC's counseling of Haitian refugees," and appellants "were only adventitiously affected by the challenged action ... a court could not recognize appellants' standing ... 'without running afoul of [the] structural principle [of separation of powers].' " *Id.* at 807 (quoting *Allen v. Wright,* 468 U.S. at 761, 104 S.Ct. at 3330) (footnote omitted). In our consideration of standing outside the associational context we have also found apposite the separation of powers root of the Article III standing doctrine. *See, e.g., United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1381–82 (D.C.Cir.1984) (Scalia, J.) (denying standing to congressman who claimed diminution of his legislative powers because an executive order allegedly conferred authority upon intelligence agencies exceeding that authorized by Congress); *see also* Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881 (1983).

> Otherwise put:
> Given the complexity and interdependence of our society and governmental policies, it will often be possible to allege with some plausibility that a change in a governmental policy is likely to cause other persons or institutions to modify their behavior in ways beneficial to the plaintiff. If such allegations were routinely accepted as sufficient to confer standing, courts would be thrust into a far larger role of judging governmental policies than is presently the case or seems desirable.

*Northwest Airlines v. FAA,* 795 F.2d 195, 204 n. 2 (D.C.Cir.1986). Thus, in a case of alleged interference with associational rights, absent "a purposeful interference, by statute or executive action," the litigant has not met the causation standard "[i]n the absence of a legal prohibition on his relationship with a third party." *Gracey,*

809 F.2d at 801. Contrary to the majority's observation, I would not establish a rule that "an organizational plaintiff could establish its standing to challenge a Government action only by showing that the relief it seeks would further its organizational purpose," nor would I require a "showing that, if it were permitted to speak, others would not only hear but listen to and heed its words." Maj. op. at 1379. Rather, I would see the standing doctrine be given substance by requiring a purposeful and legal prohibition on a litigant's association with a third party. By avoiding the possible dilution of the standing doctrine that this Court described in *Northwest Airlines,* we can simultaneously protect First Amendment freedoms while preserving the structure of separated powers, a fundamental guarantor of all the freedoms with which the citizens of this Republic are blessed.

In *Gracey,* the governmental action was directed toward protecting the borders against the entry of illegal aliens. In the present case, the governmental action is directed toward the expeditious determination of status in situations calling for "immediate action" with reference to would-be defectors. In neither case is there a purposeful interference with associational rights or a prohibition of protected conduct on the part of the plaintiff. I would therefore conclude, as Judge Bork did in *Gracey,* that the causation requirement for Article III standing has not been met.

### B. *The Buckley Analysis*

In *Gracey,* Judge Buckley observes (as Judge Bork acknowledges) that the above rationale goes beyond explicit Supreme Court precedent, and he presents "an alternative analysis of the causation requirement ... more readily inferred from Supreme Court precedent." 809 F.2d at 816 (Buckley, J., concurring); compare *id.* at 798 (Bork, J., concurring).

Judge Buckley first notes that it was by no means clear that "the Center's allegations meet the threshold constitutional requirement of standing...." 809 F.2d at

818.[2] Nonetheless, "[e]ven conceding injury," *id.,* Judge Buckley concludes that the Center failed the test of causation. In his view, the interdiction of ships on the high seas carrying Haitian potential illegal immigrants did not, under the allegations in the complaint, cause "a harm to the HRC's 'organizational purpose.'" *Id.* at 819. And the complaint contained "nothing to suggest that the HRC would be able to prove that any of the activities listed in its complaint ha[d] been appreciably affected by the program." *Id.* As Judge Buckley puts it, "the requisite showing of cause and effect will not be satisfied by speculation as to the statistical probability that one or more of the Haitian refugees intercepted by the Coast Guard might otherwise have appeared at the Center's door in Florida." *Id.* at 818. What was required was "a demonstration that a putative diminution in the number of potential clients for the HRC's services will impair its ability to provide them." *Id.* at 818–19.

As Judge Buckley demonstrates in his separate opinion, this view is entirely consistent with the Supreme Court's teachings. For example, Buckley points out that in *Allen v. Wright,* black plaintiffs had asserted that the grant of tax exempt status to racially-segregated private schools interfered with the desegregation of public schools, thus denying their children "the advantages of an integrated education." 809 F.2d at 819. Though the Supreme Court held that injury to be judicially cognizable, the Court nonetheless concluded that the complaint failed the causation test, in the absence of an allegation that "there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration." *Wright,* 468 U.S. at 758, 104 S.Ct. at 3328. Likewise, in *Gracey,* Judge Buckley concludes that "the HRC has failed to indicate how the interdiction program would make an appreciable difference in its ability to serve the Haitian refugee community." 809 F.2d at 819. Similarly, in the present case, the

---

**2.** All references to the *Gracey* opinion in this section are to the separate opinion of Judge Buckley, unless otherwise indicated.

UABA has offered us no allegation of concrete interference with its organizational purpose. One Haitian, more or less, made no difference to the ability of the HRC to perform its organizational purpose, and one Ukrainian—Medvid or another—makes no difference in the ability of the UABA to perform its organizational purposes. Therefore, I would again conclude that appellants here lack Article III standing.[3]

## II. CONCLUSION

I, therefore, join the majority's conclusion that the decision of the District Court must be reversed, but I would do so on the basis that appellants lack standing to bring their complaint to court, rather than the conclusion that appellants have such standing but fail to assert a valid claim for relief.

**3.** I also question whether UABA has standing in the prudential sense even if Article III standing were present. The fact that UABA has a First Amendment protected interest in offering advice and counsel does not imply that the protection of that amendment extends to UABA's asserted right to an audience to receive that counsel. *Cf. Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (holding that the existence of a right does not imply the existence of a claim to governmental subsidization of that right). In determining whether a litigant has prudential standing, "we must look to their particular interests," as alleged in the complaint, "not to the interests amounting to generalized grievances of all citizens." *National Federation of Federal Employees v. Cheney*, 883 F.2d 1038, 1047 (D.C.Cir.1989). The asserted lack of access to a hypothetical detained asylee is no different for UABA than for would-be spiritual counselors, newspaper reporters, or persons who merely wished the cultural experience of communicating with individuals of foreign background and diverse experience. However, because in the present case the difference between the lack of prudential standing and the failure to state a claim for relief found by the majority parallels the distinction between Tweedledee and Tweedledum, I will not engage in further discussion.