**FEDERATION FOR AMERICAN IMMIGRATION REFORM, INC., Plaintiff,**

v.

**Janet RENO, Attorney General of the United States, et al., Defendants.**

**Civ. A. No. 94-2459 (JHG).**

United States District Court, District of Columbia.

Aug. 23, 1995.

Kenneth George Starling, William Waddington Chip, Sutherland, Asbill & Brennan, Washington, DC, for plaintiff.

Donald Eugene Keener, U.S. Department of Justice, Civil Division, Washington, DC, for defendants.

## *MEMORANDUM OPINION AND ORDER*

JOYCE HENS GREEN, District Judge.

To end the massive flow of Cuban nationals fleeing Cuba in makeshift boats for the United States in the summer of 1994, the governments of the United States and the Republic of Cuba signed the United States–Cuba Joint Communique Concerning Normalizing Migration Procedures ("Joint Communique") on September 9, 1994. The Joint Communique provides for the migration of at least 20,000 Cubans per year into the United States in exchange for Cuba's promise to patrol its borders to prevent unauthorized departures.

Plaintiff, Federation for American Immigration Reform, Inc. ("FAIR"), instituted this action against defendants, Janet Reno, Attorney General of the United States, and Doris Meissner, Commissioner of the United States Immigration and Naturalization Service ("INS"), claiming that several of the methods defendants will utilize to meet the 20,000 person threshold violate federal immigration law. Defendants have moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Because plaintiff lacks standing, defendants' Rule 12(b)(1) motion is granted and this case is dismissed.

## I. *Background*

### A. The Parties

FAIR is a nonprofit, tax-exempt, charitable and educational membership organization founded in 1978. Its objectives include improving the enforcement of laws against illegal immigration and ensuring levels of legal immigration that are consistent with the capacity of the areas in which immigrants typically settle to absorb them. To achieve these ends, FAIR studies the economic, environmental, and social consequences of immigration into the United States. The results of its studies, as well as other information regarding national immigration policy, are disseminated to its members, educational institutions and policymakers.

Significant to the instant case, FAIR has approximately 1400 dues-paying members in the Miami–Hialeah Primary Metropolitan Statistic Area ("Miami PMSA"), which is coextensive with Dade County, Florida, and includes the cities of Miami, Miami Beach and Hialeah. The INS has estimated that 75% of all Cuban immigrants in fiscal years 1991–93 intended to settle in the Miami PMSA.

As Attorney General of the United States, Janet Reno is responsible for administering and enforcing all "laws relating to the immigration and naturalization of aliens", 8 U.S.C. § 1103(a), and is authorized to "parole" aliens temporarily into the United States "for emergent reasons or for reasons deemed strictly in the public interest", 8 U.S.C. § 1182(d)(5). Doris Meissner, the Commissioner of the INS, must perform any responsibilities relating to immigration delegated to her by the Attorney General, 8 U.S.C. § 1103(b), and is charged with the responsibility of collecting and disseminating information related to immigration. 8 U.S.C. § 1103(c). Both defendants are sued in their official capacities.

### B. Factual Background

The United States annually welcomes tens of thousands of refugees from around the

world. Nonetheless, it discourages mass economic migration on unseaworthy vessels to reach its shores and does not open its borders to migrants who do not qualify for refugee protection. Testimony of INS Commissioner Meissner before the House Judiciary Committee Subcommittee on International Law, Immigration and Refugees (October 5, 1994) [hereinafter "Meissner Testimony"], attached at Tab 1 to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1), at 22–23. The year 1994 presented extraordinary challenges to these policies.

In the spring, large numbers of Haitians fled the deplorable conditions in Haiti on makeshift boats and rafts to seek entry into the United States. In May 1994, President Clinton ended the policy of direct repatriation of Haitians found at sea. He instituted a new policy effective June 16 whereby Haitians were screened for refugee status on United States Coast Guard ships or in other countries. In July, further new procedures were implemented through which Haitians were offered temporary protection in safe haven camps. The cessation of air links between the United States and Haiti in early August restricted the processing of refugees in Haiti, but the United States has continued to assist Haitian refugees who fear persecution in their homeland. *Id.* at 22–25.

Also in August, the Cuban government announced that it would no longer forcibly prevent emigration from Cuba by boat. *Id.; see also Cuban Am. Bar Ass'n. Inc. v. Christopher,* 43 F.3d 1412 (11th Cir.1995). This announcement exacerbated an already irregular and highly unsafe pattern of migration that has existed between Cuba and the United States since Fidel Castro rose to power in Cuba 35 years ago. Throughout this period, Cubans who do not qualify for "in-country" refugee processing[1], have regularly set sail

on the open seas for the southeast coast of the United States.

These voyages are almost always made on overcrowded, substandard boats or homemade rafts and frequently end in disaster. The reward for those who successfully evade the Cuban boat and shore patrols, however, was that the United States did not return these would-be refugees to Cuba. The United States brought Cubans rescued at sea into this country, where they were paroled and issued work authorization. Any Cuban who was "paroled in the United States could file for asylum or apply for adjustment of status to lawful permanent resident after one year as provided in the Cuban Adjustment Act of 1966." Meissner Testimony at 26.

The August 1994 announcement by the Cuban government prompted a massive flow of Cuban nationals toward the United States. It is estimated that 40,000 Cubans attempted the perilous journey across the Florida straits in August and September of 1994.[2] Not since the Mariel boatlift in the early 1980's had Cubans fled in such numbers.[3] Of these would-be refugees, approximately 8000 arrived safely in the United States; about 32,000 were rescued at sea by United States military vessels; several hundred were lost at sea.

Effective August 19, the United States changed its policy with regard to Cuban migrants. Cubans rescued at sea were barred from entering the United States.[4] Instead, they were to be transported to such safe havens as the Guantanamo Bay Naval Station or Panama where they could remain, return to Cuba or seek lawful entry into a country other than the United States. As of October 2, 1994, there were nearly 32,000 Cubans in these safe havens. Similarly, any Cuban arriving in the United States on or

---

1. The United States offers channels for legal immigration for Cuban nationals. Since 1987, there has been a refugee processing program within the confines of Cuba for political prisoners, human rights activists, dissidents, and members of persecuted religious minorities. Meissner Testimony at 25.

2. For example, it has been estimated that 4100 Cubans arrived in the United States by boat or raft in calendar year 1993.

3. *See Louis v. Nelson,* 544 F.Supp. 973, 978–79 (S.D.Fla.1982) (subsequent history omitted) (noting that 125,000 Cubans came into the United States during the spring of 1980); *Pollgreen v. Morris,* 496 F.Supp. 1042 (S.D.Fla.1980) (subsequent history omitted).

4. The Attorney General did grant humanitarian parole to infirm or elderly people as well as unaccompanied minors.

after August 19, 1994 was to be detained rather than immediately paroled. By mid-September, approximately 725 Cuban nationals were being held in detention facilities in the United States. *Id.* at 26.

Back in early September, officials of the United States met with representatives of the Cuban government to negotiate an end to this crisis. The result of these negotiations was the Joint Communique, signed on September 9, 1994, in which the two countries recognized their "common interest in preventing unsafe departures from Cuba which risk loss of human life." Joint Communique, attached at Tab 7 to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1), at 1. The Joint Communique committed the Cuban government to "take effective measures in every way it possibly can to prevent unsafe departures". *Id.* By December, the emigration virtually ceased.

The Joint Communique emphasized the two countries' desire "to direct[ ] Cuban migration into safe, legal and orderly channels". *Id.* The United States will strive to achieve this goal in a number of ways. It will continue its policy of issuing visas to immediate relatives of United States citizens, which will result in between 500 and several thousand Cuban nationals being lawfully admitted each year. The United States also agreed to permit the migration of qualified Cuban nationals on the immigrant visa waiting list as of September 9, 1994. This measure, which the Joint Communique refers to as "extraordinary", will bring an estimated 4000–6000 Cuban nationals into the United States. In addition, the United States committed "to authorize and facilitate additional lawful migration to the United States from Cuba. The United States ensures that total legal migration to the United States from Cuba will be a minimum of 20,000 Cubans each year, not including immediate relatives of United States citizens." *Id.*

Shortly after the Joint Communique was signed, the United States announced the details of how it would meet the 20,000 immigrant threshold. First, the United States will encourage earlier Cuban immigrants to become United States citizens and then petition for the admission of their relatives. These "preference immigrant visa holders" will constitute several thousand new Cuban nationals being lawfully admitted into the United States each year. Second, the United States will admit Cuban nationals who come within the INA's definition of "refugee", 8 U.S.C. § 1157, within certain numerical limits.[5] This policy change will result in 6000–8000 new Cuban nationals in the United States lawfully.

The final new policy adopted by the United States is the special migration program for Cuban immigrants who could not otherwise be lawfully be admitted into the United States ("Special Cuban Migration Program"). These immigrants will be selected mostly by lottery from an applicant pool. Eligibility for the applicant pool is based upon such factors as language skills, job skills, education level, family ties and discrimination in Cuba.

Cubans selected under the Special Cuban Migration Program are admitted to the United States in the following sequence: (1) the INS issues documents that permit the Cuban nationals to enter and remain in the United States; (2) the Attorney General releases, or "paroles", these migrants from her custody upon their arrival and permits them to remain in the United States; (3) after one-year's residence, the migrants can apply for an adjustment of status pursuant to the Cuban Adjustment Act, Act of Nov. 2, 1966, Pub.L. No. 89–732, 80 Stat. 1161 (1966), 8 U.S.C. § 1255 note.

## C. The Complaint

FAIR asserts that as a result of the new Cuban immigration programs, its members residing in the Miami PMSA will be confronted with overcrowded public schools, decreased access to public medical facilities, reduced police protection and diminished employment opportunities. Based on these alleged injuries, it challenges a number of the methods through which defendants propose

---

**5.** In the past, the United States had a policy of restricting refugee admissions from Cuba to political prisoners.

to satisfy their obligations under the Joint Communique. Specifically, it contests the Attorney General's use of her parole authority and the decision to permit the migration of qualified Cuban nationals on the immigrant visa waiting list as of September 9, 1994.

In Count I, plaintiff asserts that the use of parole to allow ineligible Cuban nationals to "enter and remain in the United States permanently" is inconsistent with the Attorney General's statutory parole authority granted by Section 212(d)(5)(A) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1182(d)(5)(A). FAIR claims that this provision mandates that parole be temporary and that parolees are to be treated just as any other applicants for admission; FAIR also avers that Congress did not intend that parole be used to evade limits on immigration.

Count II presents plaintiff's claim that, whether or not the Attorney General is misusing her parole authority (as claimed in Count I), to permit Cuban nationals to remain in the United States based on their nationality violates Section 244A(g) of the INA, codified at 8 U.S.C. § 1254a(g). According to plaintiff, such a nationality preference can only be applied if the Attorney General declares Cuban nationals in need of "temporary protected status" because of an extraordinary and temporary condition which prevents their return to their homeland, something she has not done.

In Count III, FAIR avers that the decision to issue documentation that enables Cuban immigrants to "enter and remain in the United States permanently" is the equivalent of issuing visas to immigrants not eligible for visas pursuant to 8 U.S.C. § 1101(a)(16). Count III further claims that the issuance of this documentation to Cubans contravenes 8 U.S.C. § 1152(a)(1), which prohibits the use of preferences based on, *inter alia*, nationality.

Finally, in Count IV, plaintiff claims that the Attorney General cannot adjust the status of paroled Cuban nationals after one-year of residence. FAIR avers that, pursuant to the Cuban Adjustment Act, the status of lawfully admitted aliens can only be adjusted if the paroled Cuban "is eligible to receive an immigrant visa." Because these immigrants are not "eligible to receive an immigrant visa", FAIR claims that their status cannot be adjusted.

## II. *Discussion*

■ Presently pending are two motions to dismiss. The first asserts that this case must be dismissed for lack of subject matter jurisdiction, because the case presents nonjusticiable political questions and FAIR does not have standing. Fed.R.Civ.P. 12(b)(1).[6] The second motion avers that plaintiff fails to state a claim on which relief can be granted. Fed.R.Civ.P. 12(b)(6).

■ A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Kennedа v. United States*, 880 F.2d 1439 (D.C.Cir.1989). The factual allegations of the complaint must be presumed true, *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *see* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1357, at 304 (1990 & Supp. 1995), and plaintiff is entitled to all favorable inferences which can be drawn from those allegations. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Nonetheless, "the court need not accept inferences drawn by plaintiff[ ] if such inferences are unsupported by the facts set

---

6. A Court considering a 12(b)(1) motion can consider matters outside the pleadings without converting the motion into one for summary judgment. *See Prakash v. American Univ.*, 727 F.2d 1174, 1181 (D.C.Cir.1984); *Riley v. Titus*, 190 F.2d 653, 655 n. 1 (D.C.Cir.), *cert. denied*, 342 U.S. 855, 72 S.Ct. 82, 96 L.Ed. 644 (1951) ("A motion to dismiss for lack of jurisdiction over the subject matter is not so converted [to summary judgment] for obvious reasons. Had the court determined that it had no jurisdiction over the subject matter, dismissal rather than summary judgment would have been the proper disposition."); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366 at 484–85 (2d. ed. 1990) ("There has never been any serious doubt as to the availability of extrapleading material on these [12(b)(1)–(5), (7) ] motions").

out in the complaint." *Kowal,* 16 F.3d at 1276.

## A. The Political Question Doctrine

■■■ The political question doctrine is "essentially a function of the separation of powers". *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). It prevents the judicial branch from encroaching upon areas reserved to the other branches of the federal government. *See Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986) ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."). When the government moves to dismiss on political question grounds, the Court must conduct "a discriminating inquiry into the precise facts and posture of the particular case" to ensure that the lawsuit is not "a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.*

In *Baker v. Carr,* the Supreme Court noted that "[p]rominent on the face of any case held to involve a political question" will be:

(1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or"

(2) "a lack of judicially discoverable and manageable standards for resolving it; or"

(3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or"

(4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or"

(5) "an unusual need for unquestioning adherence to a political decision already made; or"

(6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. at 217, 82 S.Ct. at 710.

Defendants' claim that this case presents political questions is premised on cases that recognize immigration matters as "frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); *see Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953) ("the power to expel or exclude aliens [is] ... largely immune from judicial control"); *United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 542–43, 70 S.Ct. 309, 312–13, 94 L.Ed. 317 (1950) ("The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation."); *see also Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952). Defendants assert that this authority is particularly applicable here because they acted in response to an unfolding foreign policy, immigration and humanitarian crisis.

■■■ Defendants rely primarily on the first two *Baker* factors. They argue that the constitution textually commits the question of whether the Cuban aliens may be admitted to the legislative and executive branches. This textual commitment, defendants claim, can be found in Article I, § 8, cl. 4, which authorizes Congress "[t]o establish an uniform Rule of Naturalization...." Pursuant to this authority, both the legislative and executive branches have, indeed, created "an intricate system governing admission of immigrant and nonimmigrant aliens into the United States." Defendants' 12(b)(1) Memo. at 20.

This cannot be the kind of "textually demonstrable constitutional commitment" to which the Supreme Court referred in *Baker v. Carr.* Were this true, questions regarding immigration would always constitute political questions, and the Supreme Court has specifically noted that a judicial examination into immigration questions must be undertaken with a "narrow standard of review", *Mathews,* 426 U.S. at 81–82, 96 S.Ct. at 1892–93, not that it cannot be done at all.

■■■ Similarly, the government cannot rely on the foreign powers authority of the execu-

tive and legislative branches. Defendants' 12(b)(1) Memo. at 16 (noting that the Joint Communique "was a Presidential initiative and received Presidential approval"). It is true that "the conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative departments—'the political' departments of the government and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decisions." *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918); *see Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) ("over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens"). In *Baker v. Carr,* however, the Supreme Court specifically noted that "it is error to suppose that every case or controversy which touches on foreign relations lies beyond judicial cognizance." 369 U.S. at 211, 82 S.Ct. at 707; *see Flynn v. Shultz,* 748 F.2d 1186, 1190 (7th Cir.1984). Thus, the fact that this case involves foreign relations does not, in itself, render this case nonjusticiable.

■ Defendants also argue that there is a lack of judicially discoverable and manageable standards. They emphasize the broad discretionary authority given the Attorney General to implement the parole program and claim that there is no basis on which this Court can gauge their actions.[7] The Court does not agree. The Attorney General has broad, but not unfettered, authority to implement the parole program. As our Court of Appeals noted in *Abourezk v. Reagan,* 785 F.2d 1043 (D.C.Cir.1986), *aff'd,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987):

> The Executive has broad discretion over the admission and exclusion of aliens, but

that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie.

785 F.2d at 1061; *see Jean v. Nelson,* 727 F.2d 957, 975 (11th Cir.), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1984) (noting that the Executive's discretion regarding parole is broad but not unlimited). In fact, it is precisely because this is a challenge to the statutory boundaries of defendants' authority that this case *is* justiciable.

In *Japan Whaling Association,* the Supreme Court recognized that courts have "authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." 478 U.S. at 230, 106 S.Ct. at 2866. In that case, several wildlife conservation groups sought to compel the Secretary of Commerce to comply with United States law and certify that Japan was in violation of international whaling agreements. The United States had previously reached an agreement with Japan that no such certification would be made if Japan complied with certain conditions. Notwithstanding the foreign policy overtones of the case, the Supreme Court ruled that it was not a political question; the case only required the Court to "determine the nature and scope of the duty imposed upon the Secretary" by law. *Id.* As Justice White remarked, "under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones." *Id.*[8]

---

7. *See* 8 U.S.C. § 1182(d)(5)(A). Further, section 103 of the INA provides, in pertinent part:

 The Attorney General shall be charged with the administration and enforcement of this Act and all other laws relating to the immigration and naturalization of aliens.... [She] shall ... perform such other acts as [s]he deems necessary for carrying out [her] authority under the provisions of this Act.

 8 U.S.C. § 1103.

8. This principle has been reinforced in this circuit. *See, e.g., Ukrainian–American Bar Ass'n,*

*Inc. v. Baker,* 893 F.2d 1374, 1380 (D.C.Cir.1990) ("That a claim implicates important governmental policies ... does not necessarily mean that the political question doctrine precludes the judiciary from hearing it.... [S]o long as there are ... 'judicially discoverable and manageable standards for resolving' the dispute without intruding into the realm of discretion properly reserved to the other branches of government, the underlying issue is not itself a nonjusticiable political question."); *South African Airways v. Dole,* 817

This is remarkably similar to the instant case. The United States has obligated itself to a foreign country and FAIR is challenging the statutory authority that defendants invoked to fulfill the United States' obligations. It is true that defendants acted in response to an imminent, unfolding international crisis that directly impacted our borders, and their actions cannot be examined in a vacuum. *See Harisiades,* 342 U.S. at 588–89, 72 S.Ct. at 518–19 ("It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations. . . . Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference."); *Narenji v. Civiletti,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). Nonetheless, these circumstances do not render an otherwise straightforward question of statutory interpretation a nonjusticiable political question. The Court will tread lightly on this sensitive matter involving foreign affairs, but must not abrogate its responsibility to interpret the law of the land. *See DKT Memorial Fund. Ltd. v. Agency for Int'l Dev.,* 810 F.2d 1236, 1238 (D.C.Cir.1987) ("whereas attacks on foreign policymaking are nonjusticiable, claims alleging non-compliance with the law are justiciable, even though the limited review that the court undertakes may have an effect on foreign affairs"). Accordingly, defendants' motion to dismiss on the ground that this case presents nonjusticiable political questions will be denied.

## B. Standing

 An association, such as FAIR, can establish standing in one of two ways. It can have standing in its own right if it demonstrates an injury to itself, or, alternatively, it can have standing as a representative of its members on the basis of injuries suffered by those members. *Automobile Workers v.*

*Brock,* 477 U.S. 274, 284, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986). Because FAIR brings this action in its representative capacity, it must satisfy the following elements:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Defendants claim that plaintiff cannot prove the first element because no FAIR member would have standing to bring this action.[9] *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (plaintiff bears the burden of proving standing). They argue that no FAIR member satisfies either the constitutional or prudential requirements for standing. Plaintiff, in contrast, claims that the injuries to its members—identified as an increased burden on already overcrowded public schools, overused public health facilities, overworked public safety personnel and an oversaturated job market in the Miami PMSA—satisfy the constitutional and prudential requirements for standing.[10]

### 1. Constitutional Standing

 The constitutional elements of standing are that: (1) the plaintiff has "personally . . . suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant" (injury in fact); (2) the injury "fairly can be traced to the challenged action" (traceability); (3) the injury is "likely to be addressed by a favorable decision" (redressability). *Valley Forge College v. Americans United for the Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Florida Audubon Soc'y v. Bentsen,* 54 F.3d 873,

---

F.2d 119, 123 (D.C.Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987).

9. Defendants neither contest nor admit the second and third elements of associational standing. Defendants' 12(b)(1) Memo. at 27 n. 8.

10. Of course, plaintiff's factual allegations with regard to standing will be accepted as true for the purposes of this motion. *Mideast Sys. and China Civil Constr. v. Hodel,* 792 F.2d 1172, 1177 (D.C.Cir.1986).

877 (D.C.Cir.1995); *Ukrainian–American Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1378 (D.C.Cir.1990). Defendants claim that FAIR cannot establish either traceability or redressability.[11]

■ Traceability examines "the relationship between the alleged unlawful conduct and the injury." *Mideast Sys. and China Civil Constr. v. Hodel*, 792 F.2d 1172, 1176 (D.C.Cir.1986). It requires that there be a "causal connection" between the challenged action and the injury alleged in the complaint. *Defenders of Wildlife*, 504 U.S. at 559, 112 S.Ct. at 2136. This "causal connection" does not require that the alleged injury be a certainty, but plaintiff must demonstrate that the alleged injury is "fairly" traceable to the defendants' action. *Id.; International Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 803 (D.C.Cir.1985).

■ As applied in the instant case, FAIR must assert that its members' injuries can fairly be traced to defendants' allegedly unlawful immigration plan. *See Von Aulock v. Smith*, 720 F.2d 176, 181 (D.C.Cir.1983). This it cannot do. There are simply too many independent variables in the chain of causation linking defendants' actions with plaintiff's injuries. *Id.* ("we must exercise special care to ensure that standing is not being rested on 'injury that results from the independent action of some third party not before the court'") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)).

Defendants' parole plan does not require the new Cuban migrants to settle in the Miami PMSA. Although in the past Cubans migrants have settled in the Miami PMSA, this is not necessarily due to the defendants' actions. As one court noted:

> FAIR completely ignores the common fact that Florida is a desirable place to live. Indeed, for many years there has been a constant flow of immigration into Florida from not only Cuba but also from other

countries as well as from citizens of the United States.

*Federation for Am. Immigration Reform v. Meese*, 643 F.Supp. 983, 986 (S.D.Fla.1986). The Cuban migrants will be given visas to enter at any port of call in the United States and can settle anywhere in the United States that they choose.

Further, even were all new Cuban migrants to settle in the Miami PMSA, plaintiff's injuries could be abated by actions of the political branches of the Florida government.[12] The state could apportion more money for school or public health facility construction and could hire more police officers. Finally, defendants' actions do not require the new Cuban migrants to have children of school age, to send their children to public, rather than private, schools, to create the need for more law enforcement personnel, or to obtain jobs that otherwise would go to FAIR members. In short, it is impossible to conclude that plaintiff's injuries can "fairly" be traced to defendants' parole plan.

■ The redressability requirement, although "theoretically distinct" from the traceability prong, often overlaps with it. *Mideast Sys.*, 792 F.2d at 1176. This is particularly true where, as here, the claimed injury is "future injury". *Von Aulock*, 720 F.2d at 180. Redressability examines "the relationship between the injury and the requested relief." *Id.* As with traceability, certainty is not required, *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984), but there must be a "substantial likelihood" that the requested remedy will redress the alleged injury. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).

■ In the instant case, FAIR must allege that a judicial decision invalidating the new Cuban migration plan will abate its members' claimed injuries. *See Von Aulock*, 720 F.2d at 181. Plaintiff cannot meet this prong. FAIR does not challenge the United States' decision to admit 20,000 Cubans per

---

**11.** Defendants state that discovery would be required before they could determine whether to challenge the first prong.

**12.** The United States successfully fought the State of Florida's attempt to obtain additional federal funding. *Chiles v. United States*, 874 F.Supp. 1334 (S.D.Fla.1994).

year, it only challenges the methods chosen to achieve this end. Were FAIR to succeed, all it would receive is an assurance that the 20,000 Cuban nationals arriving in the United States each year would do so through "lawful" means. The public schools would be just as overcrowded, the public health facilities would be just overburdened, the police department would be just as overworked and the job market would be just as oversaturated.

In addition, were the Cuban migration program invalidated and the United States unable to satisfy its obligations under the Joint Communique, it is likely that the massive flow of Cuban nationals into the United States would resume. For example, in the first seven months of 1994, approximately 700 Cubans were rescued at sea and paroled into the United States *every day.* This would exacerbate many of the problems about which plaintiff complains because under defendants' programs, the Cubans admitted into the United States will be pre-screened for education and job skills. Accordingly, any relief is not likely to redress FAIR's grievances.

Finally, FAIR argues that it does not have to meet either the traceability or redressability prongs because it has suffered a "procedural injury". As the Supreme Court noted in *Lujan v. Defenders of Wildlife:*

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.

504 U.S. at 573 n. 7, 112 S.Ct. at 2142 n. 7; *see Florida Audubon Soc'y,* 54 F.3d at 879–80 (noting that NEPA confers a procedural right). This provision, however, does not apply because the INA does not afford procedural rights to lawful United States residents, such as FAIR's members, *Fernandez v. Brock,* 840 F.2d 622 (9th Cir.1988), and FAIR's members do not fall within the zone of interest of the immigration laws. *See INS v. Legalization Assistance Project,* —— U.S. ——, ——, 114 S.Ct. 422, 424, 126 L.Ed.2d 410 (O'Connor, sitting as Circuit Justice, 1993) (noting that the Immigration Reform and Control Act of 1986 "was clearly meant to protect the interests of undocumented aliens").[13] To hold otherwise would be to read a generalized citizen standing provision into the immigration laws.

**2. Prudential Standing**

Litigants must assert their own rights, cannot present generalized grievances and, if they sue under the APA, must fall within the zone of interests protected by the laws invoked. *Valley Forge College,* 454 U.S. at 475, 102 S.Ct. at 760; *see Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Although the Court is not confident that plaintiff has satisfied any of these requirements, ultimate resolution of these issues is unnecessary in light of the decisions reached above.

### III. *Conclusion*

For the reasons noted above, it is hereby

ORDERED that defendants' motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure is granted; it is

FURTHER ORDERED that defendants' motion to dismiss pursuant to Rule 12(b)(6) is denied as moot.

IT IS SO ORDERED.

---

13. Contrary to plaintiff's contentions, *Legal Assistance for Vietnamese Asylum Seekers v. Department of State,* 45 F.3d 469 (D.C.Cir.1995), is inapplicable. The plaintiffs in that case were family members of would-be refugees. They were, therefore, clearly within the zone of interest of the INA because "[i]n originally enacting the INA, Congress 'implement[ed] the underlying intention of our immigration laws regarding the preservation of the family unit.'" *Id.* at 472 (quoting H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680). No such policy is implicated here.