**LSG LUFTHANSA SERVICES,**
**Plaintiff,**

v.

**NATIONAL MEDIATION**
**BOARD, Defendant.**

No. CIV.A. 00–01226 ESH.

United States District Court,
District of Columbia.

Oct. 2, 2000.

Joseph L. Manson, III, Greg Avitabile, Verner, Liipfert, Bernhard, McPherson

and Hand, Chartered, Washington, DC, for Plaintiff.

Thomas C. Hirt, Caroline Lewis Wolverton, U.S. Department of Justice, Civil Division, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

Before the Court is defendant National Mediation Board's Motion to Dismiss for Lack of Subject Matter Jurisdiction. In its complaint, plaintiff LSG Lufthansa Services ("LSG") challenges defendant's certification of the Hotel Employees and Restaurant Employees International Union (HERE) as the collective bargaining representative of the craft or class of LSG's in-flight kitchen and commissary employees on Guam and Saipan. Upon consideration of the pleadings and the entire record, and for the reasons stated below, the Court grants defendant's motion.

### BACKGROUND

On February 1, 1996, HERE filed with defendant an application pursuant to section 2, Ninth of the Railway Labor Act, 45 U.S.C. § 152, *et seq.*, alleging that a dispute had arisen as to the representation of "all restaurant and in-flight kitchen and commissary employees on Guam and Saipan including support employees" of LSG. Defendant docketed the case and began to investigate the dispute on February 5, 1996. On December 3, 1997, defendant determined that the proper craft or class was plaintiff's "in-flight kitchen and commissary employees employed on Guam and Saipan" and authorized a mail ballot election to determine whether HERE was to represent the craft or class. Only those individuals employed in the craft or class as of January 23, 1996 were eligible to vote. HERE requested that the election be conducted using an on-site ballot box, but defendant denied HERE's request and decided to use Federal Express delivery services to conduct the election.

Ballots were mailed on April 16, 1998, and the count was held on May 28, 1998. Of 176 eligible voters, 90 ballots were returned, 76 were deemed valid for representation,[1] and 75 contained votes for HERE.[2] On June 1, 1998, defendant dismissed HERE's application after finding that less than a majority of eligible employees had voted for representation. On that same date, HERE filed Allegations of Election Interference, claiming that plaintiff had threatened employees with loss of benefits if HERE won; made misrepresentations about HERE; threatened retaliation against HERE supporters; interrogated employees about HERE activities; transferred employees to other facilities; and interfered with the receipt of ballots by employees. On October 15, 1999, defendant rejected all but one of HERE's allegations, finding that delivery of employee ballot packages by plaintiff's management tainted the laboratory conditions of the election.

Based on its finding of interference, defendant ordered a rerun election to be held January 17–19, 2000. It concluded that an on-site ballot box would be used for the election in light of "the unique environment of Guam and Saipan." *LSG Lufthansa Services, Inc.*, 27 NMB 18, 45 (1999). It further concluded that a "Laker"[3] ballot election was necessary "to ensure a sufficiently secret ballot box process." *Id.* Only those individuals employed in the craft or class as of January 23, 1996, the original eligibility cut-off date, were eligible to vote in the rerun election, and thus, 132 of the 225 employees were eligible to vote at the time of the rerun election. When the votes were tallied, there were 65 votes in favor

of representation by HERE, 54 for "No Representation," and one void ballot.[4]

On January 20, 2000, plaintiff filed Allegations of Election Interference, alleging that HERE interfered with the laboratory conditions of the election by providing legal assistance and representation for employees and engaging in coercive campaigning. Plaintiff also alleged that the original eligibility cut-off date of January 23, 1996 should not have been used and that use of a Laker ballot was not warranted. Plaintiff requested that defendant "issue a finding that plaintiff has stated a prima facie case, and afford it additional time within which to supplement [its] filing and further substantiate its allegations." (Crable Decl. Exh. 29 at 7). HERE filed a response on January 25, 2000.

On February 8, 2000, defendant issued findings rejecting plaintiff's allegations and certifying HERE as the designated and authorized representative of the craft or class of in-flight kitchen and commissary employees of LSG. Defendant found that plaintiff's claim that HERE provided assistance on legal claims did not state grounds for a claim for election interference; that plaintiff provided no evidence to support its claims that HERE engaged in coercive pro-union campaigning; and that plaintiff's allegations of establishing a wrong cut-off date and of improperly using a "Laker" ballot did not constitute allegations of election interference.

Plaintiff also alleges that it learned of a theft ring run by pro-union supervisors several days after the rerun election, but that in light of defendant's denial of additional time to provide further evidence of interference, it did not have the opportuni-

---

**1.** 3 votes were deemed void as not clearly indicating the employee's choice as to representation, and 11 votes were deemed invalid for lacking the employee's name and signature.

**2.** 1 vote was for "other," but the write-in space was left empty.

**3.** In a "Laker" ballot election, named after *In re Laker Airways*, 8 NMB 236 (1981), the

majority of the employees who actually vote are deemed to speak for the majority of the craft or class, including those employees who do not vote.

**4.** Presumably, the balance of the ballots were invalid. Unlike the case of the original election, the report of the rerun election results did not tally invalid ballots. (*See* Crable Decl. Exh. 28).

ty to bring the theft ring to defendant's attention.

Plaintiff now brings a complaint before the Court challenging defendant's certification of HERE as the designated and authorized representative of the craft or class of in-flight kitchen and commissary employees of LSG.

## ANALYSIS

### Standard of Review

According to Fed.R.Civ.P. Rule 12(b)(1), a claim may be dismissed if the court lacks jurisdiction over the subject matter. In deciding whether to dismiss, a court may "consider matters outside the pleadings without converting the motion into one for summary judgment." *Federation for American Immigration Reform v. Reno*, 897 F.Supp. 595, 600 n. 6 (D.D.C.1995); *see also* 5A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1366 at 484–85 (2d ed. 1990)("There has never been any serious doubt as to the availability of extra-pleading material on [12(b)(1)-(5), and (7) ] motions").

A motion to dismiss may be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Plaintiff is entitled to all favorable inferences which can be drawn from those allegations, *Federation for American Immigration Reform*, 897 F.Supp. at 600 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), but "the court need not accept inferences drawn by plaintiff[ ] if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994).

### I. Limited Jurisdiction

■ Under the RLA:
Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to deter-

mine who shall be the representative of the craft or class for the purposes of this Act.

45 U.S.C. § 152, Fourth. If there is a dispute as to the representation of a craft or class, defendant is authorized to investigate:

If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this Act, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that may have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.

45 U.S.C. § 152, Ninth. Defendant has broad discretion to carry out its investigative duties in a manner appropriate for the case at hand. *See Brotherhood of Ry. and S.S. Clerks, Freight Handlers, Express and Station Employees v. Assn. for the Benefit of Non–Contract Employees*, 380 U.S. 650, 662, 85 S.Ct. 1192, 14 L.Ed.2d 133 (1965)(acknowledging NMB's discretion, as "Congress has simply told the Board to investigate and has left to it the task of selecting the methods and procedures which it should employ in each case").

■ Thus, a court's authority to review National Mediation Board certifications is "extraordinarily limited." *Professional Cabin Crew Ass'n. v. NMB*, 872 F.2d 456, 459 (D.C.Cir.1989). It can only review defendant's decisions upon a " 'showing on the face of the pleadings that the certification decision was a gross violation of the [RLA] or that it violated the constitutional rights of an employer, employee, or Union.' " *International Ass'n of Machinists v. Trans World Airlines*, 839 F.2d 809, 811 (D.C.Cir.1988) (citations

omitted). A court may take a "peek at the merits" to determine whether "the NMB has committed an error of 'constitutional dimension or gross violation of the statute'" such that federal court jurisdiction over the matter is warranted. *Professional Cabin Crew,* 872 F.2d at 459 (quoting *International Bhd. of Teamsters v. Brotherhood of Ry., Airline & S.S. Clerks v. NMB,* 402 F.2d 196, 205 (D.C.Cir.), *cert. denied sub nom. Brotherhood of Ry., Airline & S.S. Clerks v. NMB,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968)).

In reviewing the certification decision, the Court is permitted to consider affidavits offered by defendant to provide "additional explanation of the reasons for the agency decision." *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The affidavits, however, may not provide a new rationale for the defendant's decision; rather, defendant's action must support the reasons originally given in its decision. *See id.* at 143, 93 S.Ct. 1241.

## II. Gross violation of statute

### A. Failure to investigate

Plaintiff argues that defendant's certification is reviewable in this instance because defendant did not fulfill its statutory duty to investigate the dispute raised by LSG's allegation that the union provided legal assistance and that supervisors engaged in coercive pro-union campaigning. (Pl. Opp. at 14, 22). While certifications by defendant after investigation are generally considered to be unreviewable, "reviewing a certification after an investigation by the NMB and reviewing whether the NMB made its statutory investigation at all are two completely different matters. While we cannot, and do not, review the former, we can and do review the latter." *International In–Flight Catering Co. v. NMB,* 555 F.2d 712, 717 (9th Cir.1977). "[T]he same limited judicial role results if courts consider all challenges to the NMB's exercise of its certifying authority as allegations of breach of the statutory duty to investigate, and find meritorious only those involving an investigation so inadequate as to be a non-performance of the duty." *British Airways Board v. NMB,* 685 F.2d 52, 56 (1982). Ultimately, if a court finds that the NMB has not fully discharged its duty to conduct an investigation, its certification is "an act contrary to the statute and in excess of its authority thereunder." *International In–Flight Catering Co.,* 555 F.2d at 718.

### 1. Legal assistance

In defendant's February 8, 2000 certification, it stated that "[t]he Carrier's first allegation, concerning HERE's legal and other assistance to employees in craft or class, does not state grounds for a claim of election interference." (Crable Decl. Exh. 31 at 216). In his declaration, Stephen E. Crable, Chief of Staff of the NMB, explained the reasons for defendant's determination:

> LSG's first claim was based on case law under the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169, and therefore did not state a claim for election interference under the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188. In addition, the Board's investigation into the claim revealed that the legal and other assistance that LSG claimed HERE provided to employees occurred between April and August 1998—long before the Board's October 15, 1999 order of a rerun election and the January 2000 rerun election. The investigation also established that LSG's claim was not supported by the transcript and other documents provided with the allegations of election interference.

(Crable Decl. ¶ 28). Plaintiff argues that defendant failed to investigate its claim that HERE provided legal assistance to employees, thereby interfering with the rerun election. (Compl.¶ 46). It claims that defendant "improperly assumed ... that the provision of legal assistance by a union can never interfere with the results of a representation election. Moreover, its sweeping conclusion, made without any

consideration of LSG's allegations, constituted an adjudication that union legal assistance can never interfere with an election." (Pl. Opp. at 15).

■ Plaintiff's argument appears to rest on the faulty premise that defendant's decision regarding legal assistance must be equated with an adjudication of the merits. However, there is nothing in the statute that prohibits the Board from rejecting a claim of illegal influence as being legally insufficient without first investigating the factual underpinnings of the claim, and plaintiff has offered no case support for its attempt to convert the Board's interpretation of the statute into a prohibited adjudication.[5]

■ Rather, the issue is whether the decision of the Board constitutes a gross violation of the RLA. The RLA specifically provides that in a representation election, defendant is to "insure the choice of representatives by the employees without interference, influence, or coercion exercised *by the carrier.*" 45 U.S.C. § 152, Ninth (emphasis added). This language stands in contrast to the provisions of the National Labor Relations Act, which prescribes "unfair labor practices" by both employers and unions. *See* 29 U.S.C. § 158(a)—(b). The RLA does not indicate whether union-sponsored activity can constitute interference; in fact the statute fails to define "interference" or "influence". Plaintiff provided only NLRA case law to support

the proposition that union-provided legal assistance constitutes election interference. As the Supreme Court has cautioned, "the NLRA 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.'" *Trans World Airlines v. Independent Federation of Flight Attendants,* 489 U.S. 426, 439, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989)(quoting *Trainmen v. Jacksonville Terminal,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969)). Consequently, defendant did not act "contrary to specific statutory directions" in arguably reaching a legal conclusion that union-provided legal assistance fails to state a claim under the RLA. *British Airways Board,* 685 F.2d at 56.

Second, plaintiff's argument ignores the evidence in the record before the Court. Plaintiff argues that defendant violated its duty to investigate the facts relating to plaintiff's claim of legal assistance. While the Board's decision may fail to reference the fact of or the extent of its investigation, Stephen Crable's Declaration details the factual investigation that supported a conclusion that plaintiff's allegation did not, as a factual matter, constitute election interference.[6] As indicated by the Crable Declaration, the Board conducted an investigation which revealed that any assistance that took place was too remote in time

---

**5.** Plaintiff relies on *America West Airlines, Inc. v. NMB,* 986 F.2d 1252 (9th Cir.1992), to support the proposition that defendant's finding with respect to this allegation constituted an improper adjudication. (Pl. Opp. at 15). However, *America West* is inapposite. In *America West,* the Ninth Circuit found that the Board cannot give the impression that it has "adjudicated" an unfair labor practice in conducting an investigation because it has no adjudicatory authority. *Id.* at 1259. It reasoned that Congress gave defendant no "discretion to take or withhold action, to grant or deny relief" and "no enforcement functions." *Id.* at 1256 (quoting *Switchmen's Union v. NMB,* 320 U.S. 297 at 304–305, 64 S.Ct. 95, 88 L.Ed. 61 (1943)). Here, plaintiff does not allege that defendant has engaged in an adversarial process leading to a final adjudica-

tion on the merits, but rather it appears to claim that defendant abdicated its statutory duty to investigate the dispute.

**6.** Admittedly, it is unclear from the Board's decision whether it reached its final conclusion that plaintiff's claim that HERE provided legal assistance did not state grounds for a claim for election interference based on a legal analysis, a factual investigation, or both. However, HERE made both arguments before the Board. And, as recognized in *Camp,* 411 U.S. at 142–43, 93 S.Ct. 1241, the Court is permitted to refer to the Crable Declaration for further explanation, and therefore, based on his statement, it is fair to infer that the Board had both a factual and a legal basis for its ultimate decision.

from the elections and that plaintiff's claims were not supported by the transcript and the documents submitted in support of the allegation.[7] (Crable Decl. ¶ 28). Since the Board investigated allegations of election interference and issued findings as to allegations of election interference—including a finding that "further investigation of the Carrier's allegations and assertions is not warranted" (Crable Decl. Exh. 31), plaintiff simply cannot argue that defendant failed to discharge its duty to investigate the dispute.

Thus, defendant has not committed a gross violation of the RLA in finding that plaintiff's llegation of union-provided legal assistance did not state grounds for a claim of election interference.

### 2. Coercive campaigning

In defendant's February 8, 2000 certification, it found that "[t]he Carrier has offered no evidence to support the second allegation claiming the active, coercive pro-union campaigning by two management officials." (Crable Decl. Exh. 31). Plaintiff claims it had not included any such evidence because none of the employees who had information relating to this allegation "has been willing to provide an affidavit at this time. The employees expressed fear that those supervisors and managers supporting the union would retaliate against them if they provided additional information." (Crable Decl. Exh. 29). In plaintiff's Allegations of Election Interference, it requested "that the Board issue a finding that LSG has stated a prima facie case, and afford it additional time within which to supplement [its] filings and further substantiate its allegations." *Id.*

The National Mediation Board Representation Manual states:

Allegations of election interference must be accompanied by substantive evidence. The allegations and supporting evidence must present a prima facie case, otherwise the Chief of Staff will find an insufficient basis for further investigation, absent extraordinary circumstances which justify an exception to this standard procedure. Absent extraordinary circumstances, the count will take place as scheduled and, unless a prima facie case is established, a certification or dismissal will be issued.

If a prima facie case is established, the moving party will have an additional seven (7) business days after notification by the Chief of Staff to supplement its initial filing .... Any request for the extension of time limits in this section must be supported by reasonable justification and submitted in writing to the Chief of Staff with proof of simultaneous service.

(Crable Decl. Exh. 32). Plaintiff asserts that defendant abdicated statutory duty by failing to investigate the allegations of coercive campaigning or by refusing to give plaintiff additional time to produce employee affidavits supporting its allegations. (Pl. Opp. at 23–24). However, plaintiff conceded that it did not provide substantive evidence to support this allegation in its Allegations of Election Interference. (Crable Decl. Exh. 29 at 10). Moreover, plaintiff has not demonstrated that it actually requested more time to establish a prima facie case. Instead, LSG requested that defendant first find that it "has stated a prima facie case," and then provide plaintiff with "additional time." (*See* Cra-

---

**7.** It is clear that plaintiff's allegations of union-provided legal assistance identified alleged activity that took place in 1998. (Crable Decl. Exh. 29 at 4–7). Plaintiff argues that in reaching this conclusion, defendant erred by failing to consider deposition testimony taken for another case in 1999, which supposedly indicated that the legal interference was ongoing later than the April—August time period identified in plaintiff's allegations. (Pl. Opp. at 20). Plaintiff claims that this omis-

sion was so obvious, it was defendant's duty to seek out the additional pages. *Id.* However, the deposition pages that were provided to defendant gave no indication that the alleged activity happened any closer to the election and rerun election. Furthermore, the missing deposition pages, attached to plaintiff's opposition in these proceedings, do not provide a basis for concluding that any legal assistance was provided more recently than 1998.

ble Decl. Exh. 29 at 7; Crable Decl. Exh. 32). Thus, defendant's determination that there was insufficient evidence to investigate this allegation was reasonable. What constitutes a prima facie case of interference is left to defendant's discretion, and, therefore, in determining that a prima facie case did not exist, defendant did not exceed its statutory authority.

Plaintiff's alleged discovery of a theft ring does not alter the Court's conclusion. Plaintiff claims that in light of defendant's denial of its request for additional time, plaintiff's only remedy is to have this Court order defendant to investigate its allegation that a theft ring tainted the election. (Pl. Opp. at 24). While the parties disagree as to whether plaintiff is required to, or did in fact, exhaust the administrative remedies available before bringing allegations of coercive campaigning arising from a theft ring, this Court would be subject to the same limitations governing any NMB certification review. It is clear that plaintiff did not seek an administrative remedy as to this allegation since it never raised the issue of a theft ring until it filed its complaint in this Court. Although plaintiff asserts that it did not discover the theft ring until after the deadline for submission of allegations and supporting evidence, investigation procedure clearly states that filings received after the deadline may be deemed timely under "extraordinary circumstances." (Crable Decl. Exh. 32). The guidelines also permit an extension of time limits where "supported by reasonable justification." *Id.* Because plaintiff did not take advantage of these procedures, defendant never made—nor did it have the opportunity to make—a decision not to investigate based on the allegations of the theft ring. Thus, defendant did not commit a gross violation of the statute or any violation of the Constitution by not investigating allegations of a theft ring.

## C. Cut-off Date and Laker Ballot

In plaintiff's Allegations of Election Interference, it asserted that "(1) it was inappropriate to use in connection with the January 2000 rerun election, the January 23, 1996 eligibility cut off date established for the election conducted in May 1998, because there was a turnover of a substantial percentage of the eligible electorate between the original eligibility cut off date and the rerun election; and (2) use of a Laker ballot was not warranted under the circumstances of this case." (Crable Decl. Exh. 29). Defendant's February 8, 2000 certification subsequently found that "[t]he Carrier's assertions, concerning the cut-off date and the 'Laker ballot,' do not constitute allegations of election interference. These assertions are merely statements of the Carrier's disagreement with the Board's determination in *LSG*, 27 NMB 18 (1999) ordering a rerun election." (Crable Decl. Exh. 31). Defendant argues that plaintiff waived its opportunity to assert those objections because it did not challenge either determination at the time defendant made them. (Def. Mot. at 16). On the other hand, plaintiff argues that the Court has jurisdiction because "[t]he decision ordering the rerun election was a final order of the Board for which no appeal was available." (Pl. Opp. at 29). Arguably, plaintiff failed to raise these objections in a timely manner, as defendant instructed in its letter announcing the Notice of Election and Sample Ballot for the rerun election:

> If you have any challenges regarding the eligibility or ineligibility of any individual or objections with regard to any other matters, the following procedures apply. All challenges and objections must be filed in writing, initially with the Investigator . . . . All challenges and objections must be supported by substantive evidence and argument . . . . All challenges or objections must be received at the NMB's offices no later than 4:00 p.m. December 31, 1999.

(Crable Decl. Exh. 25). Plaintiff did not raise its objections about the manner in which defendant decided to conduct the election until it included them in its Allegations of Election Interference on January 20, 2000. However, the Court need not reach this issue, because even if the claims

are properly before the Court, these aspects of the investigation were well within the defendant's discretion.

In the rerun election, defendant retained the original cut-off date from the first election to determine who was eligible to vote. Plaintiff argues that this was improper due to the fact that turnover left only 58% of the craft or class eligible to vote. (Pl. Opp. at 26). However, it is normal practice to use the original cut-off date in rerun elections, especially in cases where election interference has been found. *See, e.g., In re America West Airlines, Inc.,* 21 NMB 293, 298 (1994); *In re Arkansas & Missouri RR,* 25 NMB 92, 94 (1997). Generally, eligibility determinations and the establishment of procedures governing the election are "entirely [defendant's] affair, as long as it makes certain that the carrier does not interfere." *See British Airways Board,* 685 F.2d at 56. Thus, the setting of the cut-off date does not constitute "an action in excess of delegated powers or contrary to specific statutory directions," and the Court is without jurisdiction to review the certification for that reason.

Similar reasoning applies to plaintiff's challenge to the use of a "Laker" ballot. In its October 15, 1999 Findings upon Investigation—Authorization of Election, defendant concluded that "[t]o ensure à sufficiently secret ballot box process, a 'Laker' ballot is necessary in this case." (Crable Decl. Exh. 23 at 45). Plaintiff argues that use of a "Laker" ballot in this instance was improper, because defendant has not demonstrated that there was "gross interference with a Board conducted election." (Pl. Opp. at 28 (quoting *In re Laker Airways, Ltd.,* 8 NMB 236, 257 (1981))). Plaintiff ignores the purpose of a "Laker" ballot, which is to ensure that elections are "conducted in an atmosphere free of unlawful conduct .... [S]teps must be taken to provide both the employees and the carrier with an incentive to comply with democratic procedures .... The [rerun] election must therefore encourage maximum employee participation, and pro-

vide complete safeguarding of ballots and polling procedures." *Laker Airways,* 8 NMB at 254. Here, defendant found that the laboratory conditions required for a fair election were tainted. (Crable Decl. Exh. 23 at 45). In conducting a rerun election, defendant is authorized to conduct the election in any way it sees fit in order to prevent carrier interference. *British Airways Board,* 685 F.2d at 56. Given the breadth of discretion afforded to defendant, if after investigation defendant deems it necessary to conduct a "Laker" ballot in order to safeguard the secrecy of the ballots, that determination is unreviewable by this Court. The decision to conduct a "Laker" ballot did not exceed defendant's statutory powers, and thus, the Court cannot exercise jurisdiction over this issue.

### CONCLUSION

For the foregoing reasons, the Court concludes that it is without subject matter jurisdiction over plaintiff's claim. Based on the Court's limited power to review to the Board's decision, it cannot conclude that defendant has failed to fulfill its statutory duty to investigate the representation dispute or that it committed a gross violation of the RLA. Therefore, defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED.